**FILED**
**Oct 22, 2025**
**01:35 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION CLAIMS
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | | |
|---|---|---|
| **KELLEY D. JACOBS,** | ) | **Docket No. 2022-05-0895** |
| **Employee,** | ) | |
| **v.** | ) | |
| | ) | |
| **NISSAN NORTH AMERICA, INC.,** | ) | **State File No. 68241-2020** |
| **Employer,** | ) | |
| **and** | ) | |
| | ) | |
| **SAFETY NATIONAL CASUALTY** | ) | **Judge Dale Tipps** |
| **CORP.,** | ) | |
| **Insurance Carrier.** | ) | |

---

# COMPENSATION ORDER GRANTING BENEFITS

---

The Court held a compensation hearing on October 9, 2025, on whether Ms. Jacobs is entitled to additional temporary disability benefits and whether her permanent disability is partial or total. The main issue was whether her non-work-related spinal problems should be considered with her compensable shoulder injury to constitute permanent total disability. For the reasons below, the Court holds that she is entitled to permanent partial disability and increased benefits but not additional temporary disability.

## History of Claim

Ms. Jacobs developed right-shoulder pain while working for Nissan. She reported the injury on October 8, 2020, and Nissan furnished medical benefits. Ms. Jacobs selected Dr. Jeffrey Kutsikovich, who diagnosed a rotator cuff tear and surgically repaired it on July 14, 2021. Nissan paid temporary disability benefits from that date until the doctor released her to return to work with no restrictions on December 1.

A little over a year later, Dr. Kutsikovich diagnosed a recurrent tear and surgically repaired it on April 19, 2023. He released Ms. Jacobs without restrictions on September 14, 2023, and placed her at maximum medical improvement on November 28 with a 3%

1

permanent impairment rating. Nissan failed to pay temporary disability benefits after Ms. Jacobs's second surgery but later paid some of those benefits in a lump sum.

On the surface, this claim would appear to be fairly straightforward. However, a complication lurks under this seemingly simple set of facts in the form of an old cervical injury. Ms. Jacobs injured her neck and had a cervical fusion operation several years before beginning her job at Nissan. She testified that she healed well and had no ongoing problems, as she was able to work, raise her children, and take care of her house and seven acres. The parties agreed Nissan never had knowledge of her neck injury.

During her shoulder treatment, Ms. Jacobs began suffering from pain and other symptoms in her neck. She began seeing Dr. Erion Qamirani in November 2021, shortly before Dr. Kutsikovich released her after her first shoulder surgery. Dr. Qamirani's treatment was unauthorized, as both parties agreed Ms. Jacobs's spinal problems are unrelated to her work injury at Nissan.

When Dr. Kutsikovich released Ms. Jacobs to return to work without restrictions on December 1, 2021, she was unable to return to her job because Dr. Qamirani had recently performed cervical fusion surgery and assigned restrictions of his own. As noted above, Nissan ceased temporary disability benefits because the neck injury was not a compensable part of her claim.

Dr. Qamirani performed an additional cervical fusion in December 2022. This was followed by Dr. Kutsikovich's shoulder revision operation in April 2023. Dr. Qamirani then also performed a lumbar fusion in November.

Ms. Jacobs was never able to return to work at Nissan. As a result, she received short-term and long-term disability payments from January 12, 2022, to September 26, 2024, from a plan funded by Nissan. Her application for Social Security Disability was approved in January 2025.

At the hearing, Ms. Jacobs described constant and debilitating pain in her shoulder from the day of the first surgery, through her second surgery, and persisting today.[1] She also said that between February 2022 and April 2023, she repeatedly requested to return to Dr. Kutsikovich that Nissan largely ignored. As a result, she missed over a year of work without restrictions from an authorized doctor, which led to her termination. Ms. Jacobs also complained that Dr. Kutsikovich did not perform a physical examination or test her shoulder motion before assigning maximum medical improvement with no restrictions on November 28, 2023. She believes that, even if her neck and back were fine, she would still be unable to work because of her shoulder condition alone.

---

[1] Her neck and back also continued to worsen.

*Expert proof*

Dr. Kutsikovich testified by deposition that when he saw Ms. Jacobs in December 2021, after her first shoulder operation, she had good strength in her rotator cuff muscles. Her pain with forward elevation was common at this stage after surgery, and she "would have been off restrictions." However, he acknowledged that she had already undergone the cervical fusion, which would restrict how much she could lift. As a result, he expected her to make a gradual return to work whenever she was released from Dr. Qamirani's restrictions.

As for her shoulder injury, Dr. Kutsikovich felt Ms. Jacobs was at full duty from December 2021 until he reviewed a new MRI and met with her on March 27, 2023. At that point, he assigned temporary restrictions of occasional overhead reaching and occasional overhead activity. Then, after his revision operation on April 19, he assigned temporary restrictions of no use of the arm. Dr. Kutsikovich removed all temporary restrictions on September 13 and assigned maximum medical improvement on November 28. He did not impose permanent restrictions.

Dr. Qamirani said in his deposition that Ms. Jacobs's 2010 cervical fusion caused the adjacent levels of her cervical spine to degenerate or develop arthritis. This necessitated the two fusion surgeries he performed. He explained that adjacent level arthritis requires additional surgery after ten years in 30% of patients who have had a fusion. While Dr. Qamirani assigned several permanent restrictions to Ms. Jacobs, he deferred to Dr. Kutsikovich regarding any restrictions for her shoulder injury.

Ms. Jacobs sought an independent medical evaluation with Dr. Robert Landsberg. He assigned a 5% permanent impairment rating for her shoulder injury. He also placed permanent restrictions of no lifting over two pounds with the arm extended and 10-15 pounds with the elbow at her side, no repetitive overhead or outstretched lifting, and no more than occasional reaching. However, he admitted that her neck condition factored into his restrictions.

Dr. Alton Hunter performed a Medical Impairment Rating Registry evaluation and assigned a 6% permanent impairment rating for Ms. Jacobs's shoulder injury.

Nissan asked Dr. Douglas Mathews, a neurosurgeon, for an employer's examination. He confirmed that Ms. Jacobs had a preexisting impairment for her neck arising from her original cervical surgery. Dr. Mathews also said her more recent problems were likely from adjacent segment disease caused by the original procedure. He deferred to Dr. Kutsikovich on any question of restrictions arising out of Ms. Jacobs's shoulder injury.

Michael Galloway, a vocational expert, testified on behalf of Ms. Jacobs. He

3

reviewed her medical records and educational and vocational history, and he administered the Wide Range Achievement Test. His initial vocational analysis resulted in two opinions. First, assuming Ms. Jacobs had no permanent restrictions arising from her right shoulder injury, she would have no vocational disability related to her work injury at Nissan. Alternatively, "assuming Ms. Jacobs cannot return to work due to her combined multiple surgeries and physical impairments (neck, back, and right shoulder) . . . Ms. Jacobs would have a 100% vocational disability as a result."

Mr. Galloway wrote two addenda to his report. The first one was prompted by his review of Dr. Landsberg's evaluation report. He noted that Dr. Landsberg concluded that Ms. Jacobs's neck conditions were due to her work at Nissan.[2] Based on the resulting permanent restrictions, Mr. Galloway concluded Ms. Jacobs was 100% vocationally disabled because of her work injuries.

The second addendum addressed Dr. Qamirani's treatment records, Dr. Hunter's notes, and the deposition testimony of Ms. Jacobs and Drs. Qamirani, Landsberg, Kutsikovich, and Mattews. Mr. Galloway reiterated his conclusion that Ms. Jacobs had either 0% or 100% vocational disability, depending on whether she had permanent restrictions from her shoulder injury.

Mr. Galloway essentially confirmed these conclusions in his hearing testimony, although he added that, based on certain physical therapy records and Dr. Kutsikovich's testimony on page 36 of his deposition, Ms. Jacobs did, in fact, have restrictions from her shoulder injury that resulted in vocational disability. Taking the neck and shoulder into account, therefore, she has 100% disability.

*Arguments*

Ms. Jacobs asked the Court to award permanent total disability benefits. She suggested that this would be a quintessential Subsequent Injury Fund case if Nissan had known about her preexisting neck condition. However, citing Tennessee Code Annotated section 50-6-208(a)(4), she argued that her entitlement to total disability benefits is no different in the absence of the Fund. In short, she had a preexisting condition that constituted a previous physical disability, which with a later injury and the natural progression of the neck condition, is all that is necessary to establish total disability under section 50-6-208(a)(1). Counsel put it simply: "She was fine until she hurt her shoulder."

Ms. Jacobs also requested temporary total disability benefits for two time periods. The first, from December 1, 2021, to April 19, 2023, represents the time between when Dr. Kutsikovich released her to return to work after her first shoulder surgery until the date of the second operation. The second is from September 13 to November 28, 2023, the period

---

[2] Again, the parties agreed that they were not.

between Dr. Kutsikovich removing all temporary restrictions and later assigning maximum medical improvement.

Finally, Ms. Jacobs opposed Nissan's request for a set off of her long-term disability payments. Because the set off under section 50-6-114(b) only applies to payment made "for the same injury," she contended it would be inappropriate in this case because she received those disability benefits for her neck, not her shoulder. She noted that the disability carrier has also requested repayment of benefits paid while she received temporary total disability benefits for the same period. Ms. Jacobs argued that if she repays the disability carrier and then Nissan is allowed to set off those amounts, she will effectively pay more than she actually received.

Nissan argued that Ms. Jacobs is not entitled to permanent total disability benefits because her injury only affected her shoulder and did not aggravate or advance her spinal pathology. It contended that her non-work-related conditions and resulting restrictions should not be considered when assessing her vocational disability. Further, Nissan relies on section 50-6-208(a)(1), which requires an employee to become permanently and totally disabled "through a subsequent injury." It argued that Ms. Jacobs's rotator cuff tear was not a subsequent injury. Instead, it occurred first, meaning that the later injury in this case was the onset of her non-work-related spinal condition.

Regarding Ms. Jacobs's request for additional temporary disability benefits, Nissan contended that the medical evidence does not support her claim. Instead, any temporary restrictions on her ability to work at that time were due solely to her cervical or lumbar surgeries, and not her shoulder.

**Findings of Fact and Conclusions of Law**

Ms. Jacobs has the burden of proof on all essential elements of her claim and must show by a preponderance of the evidence that she is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2024); *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015).

*Permanent Total Disability*

The medical proof and the testimony of Mr. Galloway and Ms. Jacobs are more than sufficient to find that she is permanently and totally disabled. However, the question is whether Nissan is accountable for that disability under the Tennessee Workers' Compensation statute.

Ms. Jacobs cited several parts of section 50-6-208 in support of her claim for permanent total disability benefits. Her reliance on that section of the statute is misplaced, as section 50-6-208(2) requires the employer to prove it had actual knowledge of the prior

5

disability. Because Nissan did not know about Ms. Jacobs's preexisting neck injury, section 50-6-208 is inapplicable in this case.

Ms. Jacobs disagreed, arguing that even if the Fund were not properly implicated, section 208 imposes liability on Nissan for the cumulative effect of all injuries. This argument is unpersuasive. The purpose of this section of the statute is to establish the Subsequent Injury Fund and limit employers' liability for the effects of preexisting permanent physical disabilities. *Seiber v. Reeves Logging*, 284 S.W.3d 294, 299-300 (Tenn. 2009). A careful reading of section 50-6-208 shows that it creates no separate cause of action for permanent total disability benefits but only provides a method for making a claim against the Fund.[3]

Instead, the right to seek permanent total disability benefits is established by section 50-6-207(4)(B), which says: "When an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income, the employee shall be considered totally disabled[.]" It is well-settled that an employer takes employees as it finds them, that is, with their preexisting defects and diseases. *Sweat v. Superior Indus.*, 966 S.W.2d 31, 33 (Tenn. 1998). So, if an employee with preexisting disabilities is left unable to work because of a work injury, section 50-6-207(4)(B) provides that the employer at the time of that injury is responsible for permanent total disability benefits.

Applied to this case, this means that Ms. Jacobs is entitled to permanent total disability benefits if her shoulder injury, considered with her preexisting cervical condition, totally incapacitated her from working. The Court finds that it did not.

First, contrary to Ms. Jacobs's contentions, the sequence of events matters. That is, before her shoulder injury, her neck condition did not affect her ability to do her job. It was only after she injured her shoulder that she began experiencing symptoms related to her previous fusion. As the parties agreed that her current neck condition is unrelated to her job at Nissan, this means that her shoulder injury did not make her unable to work. Instead, the incapacity arose from the unrelated cervical conditions that manifested *after* her work injury.

Ms. Jacobs cited Dr. Qamirani's testimony that a cervical fusion creates a need for additional surgery in 30% of patients after ten years. She essentially argued that the Court should treat this likelihood of multi-level fusion and the attendant impairment as a condition that preexisted her shoulder injury. However, she presented no authority for the proposition that a court should back-date the onset of a new condition to its original, non-

---

[3] Similarly, it does not limit an employee's right to claim permanent total disability benefits. *Id.* § 5-6-208(a)(4).

6

compensable origin.[4]

Further, regardless of the sequence of disabilities, a finding that Ms. Jacobs's shoulder injury and preexisting cervical condition totally incapacitated her from working requires a finding that her shoulder injury actually contributed to that incapacitation. The evidence suggests otherwise.

Mr. Galloway initially said that Ms. Jacobs had either 0% or 100% vocational disability, depending on whether she had permanent restrictions from her shoulder injury. That opinion changed somewhat when he testified that, based on certain physical therapy records and Dr. Kutsikovich's testimony on page 36 of his deposition, Ms. Jacobs actually did have restrictions associated with her shoulder injury that resulted in vocational disability.[5] His reliance on those "facts" was erroneous.

Opinions on the permanence of an injury and the extent of permanent restrictions are the province of physicians. *Bolton v. CNA Ins. Co.*, 821 S.W.2d 932, 938 (Tenn. 1991). The *Bolton* court specifically held that a physical therapist is unqualified to give an expert opinion on permanent physical restrictions. Therefore, the Court will not consider any part of Mr. Galloway's opinion based on the therapist's conclusions.

Regarding Dr. Kutsikovich's deposition testimony, Mr. Galloway referenced part of the doctor's explanation of Ms. Jacobs's impairment rating. Specifically, the doctor said, "You know, if you have cervical spine limitations, you'll have limitations to your lifting in your upper extremity." Mr. Galloway seemed to interpret this as an opinion that Ms. Jacobs has lifting limitations because of her shoulder injury. Taken in context however, Dr. Kutsikovich was discussing why his impairment rating did not incorporate QuickDASH scores. He explained that he could not include functional scores because her neck injury symptoms would confound them. The "limitations" relied upon by Mr. Galloway are actually limitations caused by the cervical condition.

The Court is therefore left with Mr. Galloway's 0% or 100% scenario and agrees

---

[4] *Brown v. John Martin Construction Co.*, 642 S.W.2d 145 (Tenn. 1982), cited by Ms. Jacobs bears a passing resemblance to some of the facts of this case. That is, an employee with a previous spinal fusion injured his heel with a subsequent employer. He was recovering from the heel injury when he again developed back problems that left him unable to work. While this sounds somewhat like Ms. Brown's claim, significant differences exist. First, the *Brown* court did not address the present issue. Instead, under prior law and specifically applying an equitable construction, the court addressed whether the employer had sufficient notice of the preexisting condition to trigger the Fund's liability. Further, the court noted that "the initial and subsequent injuries appear to have been to the back." This is distinguishable from Ms. Jacobs's contention that no later work injury to her neck occurred, but merely she suffers a continuation or reappearance of the original injury.

[5] Mr. Galloway also testified that, even if Ms. Jacobs retained no specific shoulder restrictions, she would still be 100% vocationally disabled, if one were to "consider the neck and right shoulder together." As no legal or medical basis for such a conflation was presented, the Court will disregard this testimony.

7

that it is a proper analytic framework. Because Dr. Kutsikovich testified unequivocally that Ms. Jacobs retains no permanent restrictions from her rotator cuff tear, she retains no vocational disability from her shoulder injury.

Ms. Jacobs countered with testimony from Dr. Landsberg that he would assign lifting restrictions for her shoulder. However, Dr. Landsberg did not offer any explanation why his impairment opinion would be more appropriate than Dr. Kutsikovich's, so the Court is essentially faced with a mere disagreement, with no insight into how the doctors reached their conclusions. Further, Dr. Landsberg admitted that Ms. Jacobs's neck condition factored into his restrictions because "an overlap between neck and shoulder" exists. Finally, Dr. Landsberg only saw Ms. Jacobs once, while Dr. Kutsikovich, an authorized treating physician, not only saw her several times over a long period of time, but he twice operated on her shoulder. Under these circumstances, the Court finds Dr. Kutsikovich's opinion more persuasive.

The preponderance of the evidence therefore establishes that Ms. Jacobs retained no permanent restrictions from her rotator cuff tear. Even if she did, her incapacity arose from a condition that manifested after her work injury. This means she has not met her burden of proving under section 50-6-207(4)(B) that she suffered a work injury that totally incapacitated her from working.[6]

*Permanent Partial Disability*

Ms. Jacobs received conflicting impairment ratings from Drs. Kutsikovich and Landsberg. To resolve differences in impairment opinions, the legislature created the Medical Impairment Rating Registry. *Id.* § 50-6-204(d)(5). When the parties dispute an impairment rating, they may choose a neutral physician from the registry panel who is trained in assessing impairment under the Guides. This doctor's impairment rating is presumed correct, and the presumption may only be overcome by clear and convincing evidence.

In this case, Dr. Hunter performed an evaluation and assigned a 6% permanent impairment rating for Ms. Jacobs's shoulder injury. The parties made no attempt to overcome the presumption of Dr. Hunter's rating, so it is deemed correct.

Based on the 6% impairment rating, Ms. Jacobs is entitled to an original award of 27 weeks of benefits. *Id.* § 50-6-207(3)(A). Further, her initial compensation period expired on June 4, 2024, and she was unable to return to work. Under section 50-6-207(3)(B), this entitles her to a resulting award, which increases her original award based

---

[6] The parties agreed that Nissan would only be entitled to a set off for Ms. Jacobs's long-term disability payments if she were found to be entitled to permanent total disability benefits. As the Court has determined she is not, it will not address the set off issue.

on her inability to return to work (1.35) and her age (1.2). Using the agreed compensation rate of $749.39, Ms. Jacobs established by a preponderance of the evidence her entitlement to initial and resulting awards totaling $32,778.32.

*Temporary Disability Benefits*

To receive temporary total disability benefits, Ms. Jacobs must prove: (1) she became disabled from working due to a compensable injury; (2) a causal connection between the injury and her inability to work; and (3) the duration of her disability. For temporary partial disability benefits, she must show that her treating physician returned her to work with restrictions that Nissan either could not or would not accommodate. *Jones v. Crencor Leasing and Sales*, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7, 8 (Dec. 11, 2015).

Dr. Kutsikovich was the only physician to address temporary restrictions related to Ms. Jacobs's shoulder injury. He took her completely off work after both of her surgeries, from July 14 to December 1, 2021, and from April 19 to September 13, 2023, and Nissan paid temporary total disability benefits for those periods.

Ms. Jacobs claimed, however, that she was entitled to temporary total disability benefits for the time in between the surgeries, December 2, 2021, to April 18, 2023. She also sought benefits for the time between her release to full duty after the second surgery and her date of maximum improvement, September 14 to November 26, 2023. She argued that she only had one date of maximum medical improvement and should have received temporary disability benefits for every day before that date. In effect, she contended that the only event that terminates temporary total disability benefits is when an employee reaches maximum medical improvement. The problem with this argument is that other events might trigger the cessation of these benefits.

For example, had Ms. Jacobs returned to work at any point before maximum improvement, she would not be entitled to temporary benefits because she was not disabled from working, the first requirement of *Jones*. In this case, the problem is the second factor of *Jones*, which requires a causal connection between an employee's work injury and their inability to work. The evidence failed to establish that connection.

Although Ms. Jacobs was unable to work during both of the claimed periods of disability, she presented no medical opinion that this was due to her shoulder injury. Instead, the medical proof shows that she was under restrictions for her neck condition and not her rotator cuff tear. Ms. Jacobs testified that her shoulder would have prevented her from working even if the neck condition did not exist. Although her perception of her capabilities is relevant, it is insufficient to establish a causal connection between her injury and her ability to work. Without that evidence, Ms. Jacobs is not entitled to additional temporary disability benefits.

9

*Penalty*

Ms. Jacobs testified and presented extensive documentation about her problems getting Nissan to make appointments and authorize return visits with Dr. Kutsikovich. This caused lengthy and unnecessary delays in her treatment and was contrary to section 50-6-204 and Tennessee Compilation Rules and Regulations 0800-02-14 (2022). Therefore, the Court refers this case to the Compliance Program for investigation and possible assessment of a civil penalty. *See* Tenn. Comp. R. & Regs. 0800-02-01-.06(2). Upon its issuance, a copy of this Order will be sent to the Compliance Program. *See* Tenn. Comp. R. & Regs. 0800-02-24-.03 (2023).

**IT IS, THEREFORE, ORDERED** as follows:

1.  Nissan shall pay Ms. Jacobs permanent partial disability benefits of $32,778.32.

2.  Ms. Jacobs's request for temporary total disability benefits is denied.

3.  Nissan shall provide reasonable and necessary future medical benefits with Dr. Kutsikovich for Ms. Jacobs's right-shoulder work injury.

4.  Ms. Jacobs's attorney is entitled to a 20% fee from this award under Tennessee Code Annotated section 50-6-226(a)(1), or $6,555.66. Her attorney may file a motion for discretionary costs and an affidavit under Rule 54 of the Tennessee Rules of Civil Procedure within seven days of the date of this Order.

5.  This case is referred to the Compliance Program for consideration of the imposition of a penalty regarding Nissan's failure to timely provide requested medical treatment.

6.  The Court taxes the $150.00 filing fee to Nissan, to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 within five business days of this order becoming final, and for which execution might issue if necessary.

7.  Nissan shall file a Statistical Data Form (SD-2) with the Court Clerk within ten business days of the date this order becomes final.

8.  Unless appealed, this order shall become final 30 days after entry.

ENTERED October 22, 2025.

_____

Dale Tipps
Workers' Compensation Judge

## APPENDIX

Exhibits:
1. Deposition transcript of Dr. Robert Landsberg
2. Deposition transcript of Dr. Douglas Mattews
3. Deposition transcript of Dr. Erion Qamirani
4. Deposition transcript of Dr. Jeffrey Kutsikovich
5. Agreed Medical Records Exhibits
6. Employer's Responses to Employee's Requests to Admit
7. Michael Galloway's Vocational Assessment and supplements
8. Temporary disability payment logs
9. Long term disability overpayment notice from New York Life
10. Disability reimbursement overpayment statement from Advantage 2000

## CERTIFICATE OF SERVICE

I certify that a copy of this Compensation Order was sent as indicated on October 22, 2025.

| Name | U.S. Mail | Email | Service sent to: |
|------|-----------|-------|------------------|
| R. Steven Waldron, Employee's Attorney | | X | arlenesmith@wfptnlaw.com |
| Stephen Morton, Employer's Attorney | | X | Stephen.morton@mgclaw.com Amber.dennis@mgclaw.com |
| Compliance Program | | X | WCCompliance.Program@tn.gov |

_____

**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov

11



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
   ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
   ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

### Parties
**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.


_____

*[Signature of appellant or attorney for appellant]*